1-3-2-4-3-9 Antonio Garcia-Dorantes v. Millicent Warren Arguing Controversy 15-25 Mr. Pallas, 4-1-1 Good afternoon. May it please the court, John Pallas, Assistant Attorney General for the State of Michigan on behalf of Warden Millicent Warren. This is our appeal. I'm going to leave because I want to make sure that the court hears what we have to say about the strength of the evidence in this case. This court knows what its test was in Ambrose. This court has to follow its own test in Ambrose. In this court's opinion in Ambrose, this court referenced the Strickland definition of prejudice to assist in coming to that task. And that definition is, quote, the defendant must show that there is a reasonable probability that, and there are some ellipses, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome. It would be less than 50% easily. Yes, that's correct. It wouldn't be some sort of infinitesimal margin. No. 50.001 compared to 49.001. No, it's not a more likely than not type of analysis. And this court, as it indicated in Ambrose, that the most important factor to consider when determining whether or not there's actual prejudice is the strength of the evidence. And I think looking over this case again sort of with fresh eyes over the last couple of weeks, the testimony that struck me and seemed to be as most significant than anything else in this case is the testimony of the medical examiner. Now, this medical examiner, admittedly, yes, he's a state employee, but he's essentially an unbiased person. He doesn't work for the prosecution. He doesn't work for the defense. And he testified that there was a, quote, unquote, very forceful strike with this knife. And it went three and three-quarters or three and three-eighths inches deep through bone into vital organs. And this is very significant on page ID 397. He said in his expert opinion, quote, I don't believe it would be consistent with a defensive jab at the person. So even if you say, well, you know, you had witnesses on behalf of the defense, you had witnesses on behalf of the prosecution, or you say everyone was drunk, even if you accept all of that, I think the medical examiner's testimony is really, really powerful, strong, compelling evidence of this individual's guilt. So you're saying that in each of these cases we have to determine how overwhelming or not overwhelming the evidence is essentially? To the extent that it would undermine confidence in the verdict. That's correct. I think it is analysis, an analysis that looks very closely at the evidence presented. How many cases were tried in the criminal courts, the circuit courts, of Kent County during the 15-month period or so? I don't know the answer to that. I know there's approximately between 9 and 11 of these cases currently pending either in this court or in the district courts. I would assume that any others at this point would be statutorily barred by the statute of limitations. Which statute of limitations? The ADPA statute of limitations. So I think what we're looking at, and not to use a phrase to confuse things anymore, but the pool of cases that we're looking at. Don't use that word. I won't. I won't any further. Is approximately 9 to 11. No tolling problems there, you think? No tolling questions? In these cases? Yeah, all these cross-section cases, yeah. I don't believe there is at this point. Any issues, any defenses that have been raised and rejected, and I think we're at the point where we're either considering cases that have been defaulted or whether or not we're going to move ahead to the merits. So I think that's really the only defense that's at this juncture available for those cases that are presently pending either in this court, which I believe this is the only one currently, and then the rest of them are still pending in the district courts. Perhaps they're waiting for this court to rule. Unresolved, as of yet, in most of those cases in the trial court. That's correct. There are several of them that have just been pending for years. Ever since this case, was it before this court the first time, and it's still pending, I think, depending on, it could be that the district courts are waiting for this court to rule. In this case, for maybe perhaps some more guidance on strength of the evidence or actual prejudice. But even if you continue to look at the other evidence besides the medical examiner's testimony, we believe that the state's case included pretty consistent and compelling evidence from the prosecutor's point of view, that is being the victim's friends. They were pretty consistent in saying that the petitioner started this confrontation while holding a knife behind his back. In other words, that he was the initial aggressor. They were consistent that the petitioner knocked the victim to the ground after the victim said he wanted no trouble and would call the police if necessary. And it's interesting here that in all of this struggling that was going on and the petitioner claiming to be in such fear, that he had no other real injuries other than a small scratch on his neck, whereas the victim and the deceased victim, as well as his other friend, sustained some pretty serious knife wounds. The other thing that's troubling about the evidence in this case... So you're really saying to us, I just want to be clear, that we, the federal courts in all these cases, have got to make a judgment about how strong the case was in the trial courts some years ago. That's correct. That's exactly what I'm saying. And I think that's exactly what this court was saying in Ambrose when it said that perhaps the most important factor in determining whether there was actual prejudice. Maybe we did. Maybe that's the implication of it. But that's certainly not what I understood we were saying. Well, perhaps this case will help resolve any ambiguities or inconsistencies. But at least the way that we read the Ambrose opinion, and I think we're reading it correctly anyway, is that the strength of the evidence is the most important factor to consider when determining whether there's actual prejudice. And to continue along that line, the petitioner testified at this trial, and his story that the victim started the whole thing is not credible. There's a number of reasons for that. First of all, he gave multiple stories to the police and at trial, and at trial he just basically said, well, I don't remember, I don't remember, I don't remember. His supporting witnesses weren't much better, including his wife, who admitted that she had lied previously. Then there's this whole incident that's pretty stunning, and you have to think about this for a second. If you have an individual who's a petitioner who claims he's in fear of this person, the victim, then why in the world would he race after him and smash his car in the rear several times? Now, I understand his version of events is that, well, the vehicle that the victim was in suddenly came to a stop and there was this collision. Well, why was he even close to this person that he was so in fear of? It would seem to me, if I were somebody like petitioner and claimed that I was afraid of this alleged gang individual, that I'd go the other way. I wouldn't follow him and follow him so closely that I end up hitting him when he hits on his brakes. So that story just doesn't seem very credible. And there's absolutely no support, and this really troubled me about this case, about the theory of a victim and his friends being gang members, which was sort of the theory at trial. And there was testimony from Grand Rapids police officers who said that none of these individuals on the victim's side were in a gang database, they were older than typical gang members, and they weren't dressed in a manner consistent with gang members. How did the district judge come to this wrong conclusion that you say he came to? Well, I think there's some mistakes, quite frankly, in this. What are the mistakes that he made? Because he's not applying the standard that was applied in his companion case, which basically say there is, which contain an analysis that leads pretty strongly to. Well, one of the things that he talked about, and maybe it's not as much as a mistake as it is sort of a minimization of the medical examiner's testimony, he said in his opinion that, well, that's consistent, the medical examiner's testimony is consistent with the story that the petitioner had, that the victim was charging at him and that he thrust in response. But the medical examiner, and I think this is a very important thing to try to picture, and I tried to sort of picture it myself, what the medical examiner was testifying, was that it was a up and down motion like this, from above and down into the victim. And the medical examiner testified, there was some expert testimony from him about, well, if the victim is charging, presumably sort of bent over and heading towards the petitioner, how could he get that type of injury? And the medical examiner said something along the lines of, well, he would have to charge and then have his neck up like this, sort of in a very contorted fashion.  And I think as my esteemed colleague said, I don't see any reason why this court can't do its own de novo review of the facts and the evidence. This isn't an AEDPA case, strictly speaking, where there's deference to the state court because there wasn't a state court opinion here. And certainly there isn't any reason to look at this and say, well, we have to give some credence to what the district court did because the district court just sort of, in order to reach the conclusion that it did, and I respect this district court judge, but I just disagree with this overall characterization of the evidence in this case. It just, to me, seems like an overwhelmingly strong case, especially when you think about a jury problem. Excuse me. Go ahead. Let me push back a little bit. Clearly the trial judge in the state court felt that the evidence supported instructing the jury on four theories, first degree murder, second degree murder, voluntary manslaughter, and not guilty by self-defense. And the jury struggled with it. I mean, they didn't accept either side's view, and they sort of went in the middle, you know, second degree murder. They didn't go with first degree murder. They didn't go with self-defense. So doesn't that suggest that they were wrestling with this issue of intent? And this wasn't a clear case. If it was a clear case, it would be first degree murder. Well, Judge Polster, I think it might be a different situation if the jury had deliberated for days. This jury only deliberated for a little over three hours. So whatever their conclusion was, they came to it fairly quickly in terms of determining what this case really was. I don't know that there was as much of a – it's hard to know to get into the minds of the jurors as to what occurred here, but certainly in my experience, three hours of deliberation in a case of this severity is not very long for a jury to deliberate. And for that reason, I'd say that the evidence in this case, as well as the other reasons that I've discussed, is just – Counsel, if you change the character of the jury by adding or subtracting a member or two, you change the dynamics of the discussion in the jury room, and nobody can be very clear, or it's pure speculation, of course, what the dynamics would have been if you had a different jury. You don't know who would be the foreman of the jury or how the discussion would have gone. It's all up in the air. I'm glad you brought that up, Judge Merritt, because actually it was going to be my next point, was really I think what this case – what this court did in the Ambrose decision was talk about or reflected or referenced a so-called mixed-race case. And by reference to the cases that this court cited, a mixed-race case is where you have a victim of one race, a defendant of another race, and then the – can I conclude with my statement? And a jury where excluded members are of the race of the petitioner. That's not the case here. These are all Latinos by and large, the witnesses other than the police officer witnesses who testified. So unless you have any questions, I'm – I mean, you can take language like that, which is intended to give some kind of guidance as to the kind of thing to look for, and turn it into a test. It's a standard thing that happens in the law. Language gets turned into tests. But I'm not sure that because that language is in there that that's a be-all and end-all test. No, and we're not suggesting that, Judge Rogers. It was more about guidance to the lower courts as the kind of situation where there might be actual prejudice. Thank you. I don't think it's necessary to give another closing argument on behalf of Mr. Garcia-Durantes. I think that the record here speaks pretty clearly that this was a close case. There was never any dispute about it. Do you owe any deference to the district court? No, I agree with the Attorney General's office. This is a cold record. I mean, with respect to Professor Summers' testimony and those factual conclusions, yes, absolutely, this district court should get deference. But on the cold record of what happened at this trial, no. I think it's clear based on a reading of that record that any different jury could have come out differently. This was a close case. The only question was his level of criminal responsibility, and the jury had, I believe, four options, and they came down on three out of four. But it could have been manslaughter, and it could have been voluntary self-defense. These men were all inebriated, and nobody knew what the heck happened, saw what happened, remembered what happened. This could have come out any different way. But the truth is that Justice Scalia described this as speculative inquiry into what might have occurred in an alternate universe. That's what the court is engaged in here. That's every tort case, though, right? Well, yes. It is. Yes, it is. That's an epithet that just applies so generally that it doesn't carry much sting. Well, we're talking about here the availability of relief for structural constitutional rights, though. That means we were wrong the first time around. Well, I believe, with all respect, Your Honor, I believe the court was wrong. You were wrong. But for a different reason than I was. We're asking you for argument based on the assumption, if you can get there, that it wasn't wrong. Well, okay, so the court asked for actual prejudice. And what we established is that actual prejudice exists in every case provided three things. Number one, that the excluded group was African Americans. Excuse me, provided two things. That the excluded group was African Americans. Number two, that the evidence wasn't so strong that no jury could acquit. The state seizes on that word could instead of would in the court's standard. But I think that that just supports us. If the evidence is so strong that no jury could acquit, essentially it's the reverse of sufficiency of the evidence claim. No jury could acquit. Then we've established actual prejudice, and it merges. And the court, at least with respect to this particular structural claim, this court doesn't need to adopt the rule I argued last time, which is that any structural claim, actual prejudice is presumed. The court doesn't need to go there. The court merely needs to say, look, we sent this back. We did the best we could given this difficulty. We sent it back, and the record now shows, number one, that some of the assumptions were wrong. This mixed race question, maybe 50 years ago, the court would have been right that in a mixed race case, actual prejudice is more likely. But today, social science tells us that the opposite is true, that an all-white jury might be more alert to these things and try to counteract the biases, the overt biases, that might take over in a case involving really mixed race facts that sort of lend themselves to what the court says. This wasn't relied upon by the district court in this case. Well, the district court, not in this case, no. The district court in this case, but it was presented to the district court, and that's an error I believe the district court made. This evidence is in the record in both cases. Has any court adopted the standard you've just articulated that in a cross-section case that actual prejudice exists in every case, assuming the excluded group was African American and the evidence was not so strong that no jury could possibly acquit? No, Your Honor. Okay. This court would be, I believe that would be true to both lines of Supreme Court authority, and the court doesn't need to answer the question whether in the next case Asians were systematically excluded. Does actual prejudice exist there? The court doesn't need to answer that question. Perhaps the Supreme Court will clarify matters in the interim. But you're going to argue that in every case, right? Well, you have to show systematic exclusion, and I can name on one hand or probably three fingers the number of times systematic exclusion has actually existed. You need to cross that barrier before we even get to this question. But you are arguing something that's more than is necessary to uphold what the trial court did below. I think it is appropriate, particularly given the makeup of the panel here. I think this court knows what it meant, and this court is in a better position than a different panel would be to explain the first decision and what the law should be. I think there's a lot of confusion arising out of Ambrose 1 because it doesn't acknowledge that those two lines of Supreme Court authority that don't make any sense together. I think the Supreme Court has implicitly overruled the Francis, the Henderson-Davis rule, I think this court called it. But they haven't done so explicitly. This court tried to do the best it could with those lines of authority, and here we are three years later, and we know that they're actually under the standard the court adopted. It's a racially discriminatory procedural bar, and that doesn't make any sense. The court doesn't need to say what would happen in the case of systematically excluded Asians. That's not this case. I think it's sufficient to say that the record in these cases, there is a place for an examination of the trial court record, and that place is to determine whether or not the evidence was so strong that no jury could have acquitted, regardless of its racial composition. And we described those below, I think, as the slow plea type of cases. You're trying to preserve an issue for sentencing, something like that. Maybe you have a death case. Like Tsarnaev. Excuse me? I mean, you're saying it's got to be like the Tsarnaev case where essentially they're not contesting guilt. They're just arguing it in the sentence. I believe that's how Professor Summers articulated it. At least that's how I attempted to articulate it in my questioning of him, and I think it supports it. Do you think it was appropriate to consider Professor Summers' testimony? Absolutely. Isn't he suggesting we constitutionalize racial stereotyping? Regrettably, Your Honor. How do you square Batson with that? I don't think we should be engaged in this analysis, but, again, that's the argument I made three years ago, and it was rejected. I think all the parties agreed that it should be a bright-line rule. Either you win them all or you lose them all, and the court did the best it could with two competing lines of authority and said, let's take a closer look. And we had this hearing, and those are just facts. That's what the empirical evidence shows. Now, can we square that? I mean, the state is invoking Justice Marshall and saying that there should be no place in the law for this sort of discrimination. I agree. But the court rejected that argument when we were here before, and so the reality is that different races act differently, and the court should acknowledge that reality. And actual prejudice exists when there is a meritorious claim of this type under these circumstances, and the evidence is not so strong. So it being a meritorious claim. Of course. It should merge, provided that the evidence is not so strong that no jury could acquit, the case where things aren't really contested. Now, returning to something I said earlier, I don't think that the one African-American on a veneer has the same chance of being put on a pettit jury than any other white person. I certainly don't think that the third or fourth African-Americans, which is where the difference played out in these cases, has the same chance. I think they have a much better chance of being placed. And, again, this is why we're not asking for randomly selected pettit juries of 12 and why that remedy that Judge Ludington bought into and that the state is arguing doesn't make sense. One thing that bothers me in this case, too, factually, is how many African-Americans were actually placed in the weekly veneers because in the Brady case, it went before the Michigan Court of Appeals and the Michigan Supreme Court. A clerk testified that she brought to the attention of her supervisor, administrator, in the clerk's office that two or three months after this computer change had been made that there were fewer African-Americans being placed in the pool and that she herself, because she had the power to place people, she herself took it upon herself to try to make up the difference by picking out African-Americans and putting them, despite the fact that they weren't in the veneer, putting them in the veneer. Now, that statement, those facts are recited in one of those Brady cases, and so we don't really know how many times that occurred, do we? We don't. There was testimony during two different depositions in the Powell case, which is pending in front of Judge Hood, where a jury clerk, with the best of intentions, it appears, she saw there was a problem, she was complaining, and nobody was addressing it, and she said, when there's a black defendant, I'm going to handpick out of the jury assembly room with a few hundred people on a Wednesday morning, I'm going to handpick the African-Americans and put them into that veneer. And we offered that in the Parks case as a possible explanation why he happens to have had three African-Americans, the precise correct number, in his veneer. She was picking them, at least in some cases. At least in some cases. We don't know how many or what. In the first deposition, it was a pretty common pattern. By the time we did a second deposition. She was picking quite a few of them out and putting them on the jury. By the time we did a second deposition, she changed her testimony a little bit and said it was a once-in-a-while thing and it wasn't a pattern. And so that's really what the evidence shows. Now, every one of these petitioners had an opportunity to raise an equal protection claim, and the only one who took that opportunity was Mr. Powell. He has that separate claim based on her handpicking people on the basis of race. There's an equal protection claim in that case. It doesn't exist in the others. This is not this case you're talking about. It's not. I'm trying to answer Judge Merritt's question. I think this shows why an analysis of the entire pool, as the state has suggested. It may have been, though, that she didn't put somebody on in this case because she had put them on in another case. Right. I mean, I don't know what the reason is. That's correct. And I think it supports the Sixth Amendment claim we've got. It could conceivably give rise to a separate equal protection claim, but that's not in this case. Mr. Garcia-Durantes hasn't raised it, but I think it complicates the fair cross-section claim, and it shows why we should be looking at the entire pool and what the veneers look like. And if you do the analysis that I suggested before, the disparity of risk analysis, what you see in this case, is that Mr. Garcia-Durantes had 43 people in his veneer, and he should have had actually four African-Americans. It comes out to 3.543, and you need to round for this analysis, so you round it up to four. He should have had four African-Americans and a veneer of 43 people. The chance of having fewer than four with a correct veneer was 52%. Now, that's interesting because what's it? Did he have three? We don't know who he had. No, we don't know what he had. The probability? He should have had three. He should have had four. Fairly selected. The probability of having fewer than four was 52% based on a clean, would have been 52% if there were no computer glitch. And it jumps to 85% because of the glitch. They could have been four in this case. We just don't know. We don't know. There's an 85% chance that there were fewer than four. And the interesting part about this is that being 52% at the first line of analysis, the Michigan Supreme Court's rule in Bryant couldn't possibly be met here. Since there was already a 52% chance of too few people, you couldn't reach a 50%. Why is it a violation if there could have been four and we don't know? How do we reach the conclusion that there was an unfair cross-section here? What this disparity of risk, comparative disparity of risk analysis tells the court is the chance of having fewer than the correct number on the veneer increased by 33%. It was a 33% increase in this case. It was a two-fold increase, 35% to 70% in the Ambrose case. Significant numbers. Increases in the chance that you're going to have too few people, that you're not going to get that third or that fourth African-American who I believe, I don't have statistics to show this, but who I believe has a much greater chance of landing on the pettit jury. But with this young woman in the clerk's office picking and choosing veneers and pools to put people on, we don't know which pools may have been under the statistics of a fair cross-section and which pools were not, do we? No. That's why the court has to listen. Is this business about the woman? Is that in the record of either of these two cases? I do not believe so. I'm not certain. Thank you. In the record of the Brady case, at least the court itself recites that evidence from the record of that case. In the Parkes case, which was here a year or two ago, it's in the record there to explain why. There may have been three people in the jury veneer there. Are you really saying that we've got to embrace Dr. Powell's testimony of racial profiling in fair cross-section cases while at the same time we've got to absolutely prohibit racial profiling in making peremptory challenges on pettit juries? Aren't they just fundamentally at odds? Yes, for the reasons I— We have Batson. That's the law, so don't we have to totally reject what that expert's saying? He's just saying his whole framework is unconstitutional, so we ignore it. We reject it. I don't believe so. I think this court set up a framework— We didn't tell the district judge he had to get expert testimony. We said that focus should be the strength of the case. I mean, he did it, but now that we see what he's saying, isn't that just an unconstitutional inquiry? What it proves is that the original test may have been based on assumptions that weren't correct, and a better test would ignore race and would say that if you have a structural claim of this nature and the evidence isn't so strong that no jury could acquit, you've proven not only a meritorious claim, but you've proven actual prejudice. And if the Supreme Court sees fit to finally square those two lines of cases, then I think the Supreme Court is going to have to do so. I don't think the court has to do that, but obviously for the reasons I argued three years ago— We can change our mind, right? I think so. We need to decide differently than we did before. I think the court needs to take into— In what respect exactly do we need to change the opinion that was previously filed? The court should first acknowledge that line of Supreme Court authority saying this is impossible to prove. The court should second say we did the best we could the first time around. We sent it back, and the record now shows that actual prejudice is established in every case provided that the excluded group is African American and provided the evidence isn't so strong that no jury could acquit. So that being the case, this court can't embrace a procedural rule that is racially discriminatory. The court needs to embrace the rule that at least with respect to fair cross-section claims— The court doesn't need to look at every other structural claim that exists, but at least with respect to this type of claim, the rule is if you establish a meritorious claim and the evidence isn't so strong that no jury could acquit, then you've established— A meritorious claim is established by any what? Systematic exclusion to the extent that the population on the jury pool is not fair and reasonable and veneers is not fair and reasonable. If you've established that, then you've established actual prejudice, so long as the evidence— Fair and reasonable is to have approximately the same number of blacks that exist in the census information, right? Well, I mean, there are a lot of ways to look at it, and we're still trying to come up— the courts are trying to come up with the best way of looking at it. This court has a chance here to refine some of that. But I think 72 percent, I believe it was, maybe not that high, but I think the numbers here really speak for themselves, as every federal judge to look at this case has found. Thank you, Your Honor. Your Honors, let me just start right out of the gate with the jury clerk's testimony. At best, that raises an equal protection claim that's not before this court. So unless this court has any questions about that, I'm just going to move on from that. It's not before the court. Let me then move— It's not before the court? What is not before the court? An equal protection claim. Right. And I think that's, at best, what the— We have only a fair cross-section, Sixth Amendment claim before us. That's correct. That's correct. In fact, the petitioner in this case has never raised an equal protection claim, and I think I heard Brother Counsel admit as much. So I think it's an interesting discussion, but really not relevant for purposes of deciding this case. And I want to maybe go back to a point that you made, Judge Merritt, about the likelihood of African Americans being on this particular petit jury for purposes of actual prejudice. What we're talking about here is possibly one or two missing African Americans in this veneer of 43. We're talking about, based on the statistics that we talk about in our brief, a number that maybe would have been four and possibly then reduced down to two. And how we come about that calculation is really by relying on Dr. Rothman's report, which I think needs to be the report that this court relies on, both for determining actual prejudice as well as for the merits. And the reason for that is that Dr. Rothman's report covers the entire period at issue here. It's from April of 2001 until August of 2002. Dr. Stevenson's report only references three months in 2002, January, February, and March of 2002. This case was tried in August of 2001. Your basic point here, if I understand it, is that we don't know how many African Americans were, in fact, on this pool or any other pool because there's no evidence about that one way or another. The only case that there's any evidence of that in that I'm aware of is the Parks case. But in this particular case, as well as the Ambrose case, there isn't any evidence. And it isn't for lack of trying. As Brother Counsel indicated, there were efforts made on both parties' part to try to see if that could be reconstructed, and we just couldn't do it. The cases were just too old by the time that we all got involved in this, unfortunately. If we had a case in the future where that was available under our test, it would be relevant. It would be relevant under actual prejudice, certainly, yes. Under the merits, it wouldn't be because the question is about the veneers, generally speaking, not an individual veneer. So unless Your Honors have any further questions, I'll simply rely on the brief we filed. Hopefully we've all helped you come to a correct and just decision in this case. You probably won't like what we do this time. Thank you, Counsel. Maybe you will, I don't know. Thank you, Your Honors.